IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |
|---|---|
| AMY POMEROY,<br><br>      Plaintiff,<br><br>v.<br><br>UTAH STATE BAR, et al.,<br><br>      Defendants. | **ORDER AND MEMORANDUM DECISION ON MOTIONS FOR SUMMARY JUDGMENT**<br><br>Case No. 2:21-cv-00219-TC-JCB<br><br>District Judge Tena Campbell<br>Magistrate Judge Jared C. Bennett |

Plaintiff Amy Pomeroy sued Defendant Utah State Bar (Utah Bar) and officers and members of the Utah Bar under 42 U.S.C. § 1983 and 42 U.S.C. § 1988.  Ms. Pomeroy contends that the Utah Bar has violated her First and Fourteenth Amendment rights to free speech and association by compelling her membership in the Utah Bar and engaging in activities that are not germane, that is, relevant or connected to, regulating the legal profession or improving the quality of legal services available in Utah.  She also argues that the Utah Bar has violated her free speech rights for failing to provide safeguards to ensure members' mandatory dues are not used for impermissible purposes.

Both parties have moved for summary judgment.  (Pomeroy Mot. Summ. J., ECF No. 127; Utah Bar Mot. Summ. J., ECF No. 128).  For the reasons stated below, the court denies Ms. Pomeroy's motion for summary judgment and grants the Utah Bar's motion.

## BACKGROUND

The Utah Bar is an integrated bar, meaning that attorneys must join and pay compulsory dues to the Utah Bar if they want to practice law in Utah.  See Utah Sup. Ct. R. Prof'l. Prac. 14-102(d)(1) ("A person may only practice law in Utah if that person is a licensed lawyer and an active [Utah] Bar member in good standing[.]").  The Utah Supreme Court has authorized the

Utah Bar to "administer rules and regulations that govern the practice of law in Utah" and "assist the Court in governing admission to the practice of law."   Rule 14-102(a)(1), (2).  Purposes and responsibilities of the Utah Bar include: "advancing the administration of justice[,]" "fostering and maintaining integrity, learning competence, public service, and high standards of conduct among those practicing law[,]" "providing a service to the public, to the judicial system, and [Utah] Bar members[,]" and "assisting [Utah] Bar members in improving the quality and efficiency of their practice[.]"  Rule 14-102(b)(1), (4), (8), (10).

The Utah Bar also has authority to engage in legislative activities.  It may "study and provide assistance on public policy issues and … adopt positions on behalf of the [Utah Bar] Board on public policy issues."  Rule 14-106(a).  The Board of Commissioners to the Utah Bar is "authorized to review and analyze pending legislation, to provide technical assistance to the Utah Legislature … and to adopt a position in support of or in opposition to a policy initiative, to adopt no position on a policy initiative, or to remain silent on a policy initiative."  Id.

Among its various activities, the Utah Bar uses member dues to publish the Utah Bar Journal six times each year and operate social media accounts.  The Utah Bar's mission and vision is that "[t]he lawyers of the Utah … Bar serve the public and legal profession with excellence, civility, and integrity.  [The Utah Bar] envision[s] a just legal system that is understood, valued, and accessible to all."  Mission & History of the Bar, Utah State Bar, https://www.utahbar.org/about/.

The Utah Bar has established procedures through which members who object to the expenditure of their fees on activities—legislative or otherwise—can apply for a rebate and, possibly, receive a refund.  Utah State Bar Keller Refund Request Policieis [sic] and Procedures, https://www.utahbar.org/wp-content/uploads/Keller-Refund-and-Objection-Procedures.pdf.  Utah

Bar members who object to expenditures on legislative activities must apply for a rebate in writing to the Executive Director after the Utah Bar Journal publishes its annual notice of rebate. Id.  "Any member of the Bar who objects to the expenditure of funds by the Board may apply for a license fee rebate in an amount representing that member's pro rata portion of the amount of the lawyer's licensing fees spent on legislative activities … for the preceding 12-month period." Id.  Members objecting to "the use of any portion of the licensee's license fees for activities he or she considers promotes or opposes political or ideological causes which are not already included in the rebate may request the Board to review the licensee's objections."  Id.  Within 45 days of the publication of the notice of rebate, members must object in writing and submit their objections by mail to the Executive Director.  Id.  The Board will then review each written objection, respond to each, and, if the Board agrees with the objection, "immediately refund the portion of the licensee's dues that are attributable to the activity, with interest paid on that sum of money from the date the licensee's fees were received to the date of the refund."  Id.  "The Board's response[s] [to each objection] will include an explanation of the Board's reasoning in agreeing or disagreeing with each objection."  Id.

Ms. Pomeroy, as a Utah lawyer, "is compelled to [be] a member of the [Utah Bar] and to pay an annual fee to the [Utah Bar] as a condition of engaging in [the legal] profession." (Compl., ECF No. 2 at ¶ 33.)  She challenges those requirements because the Utah Bar has used her dues to engage in what she alleges are objectionable non-germane activities, including lobbying, publishing the Utah Bar Journal, and making statements on Utah Bar social media accounts.  She also argues that "[b]ecause the U[tah Bar] refuses to implement adequate procedures to allow [her] to avoid funding objectionable non-germane activities with her

membership dues, [the Utah Bar] has violated its obligation to implement procedural safeguards as [required and laid out by] the Supreme Court[.]"  (ECF No. 127 at 2.[1])

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those that might affect the outcome of the case.  See Birch v. Polaris Indus., Inc., 812 F.3d 1238, 1251 (10th Cir. 2015) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

Once the movant shows there is an absence of a genuine dispute of material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citation omitted), the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[W]hile [courts] draw all reasonable inferences in favor of the non-moving party, 'an inference is unreasonable if it requires a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility.'"  GeoMetWatch Corp. v. Behunin, 38 F.4th 1183, 1200 (10th Cir. 2022) (quoting Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A., 858 F.3d 1324, 1334 (10th Cir. 2017)).

"The standard for cross-motions for summary judgments is the same as for individual motions for summary judgment."  Cannon v. State Farm Mut. Auto. Ins. Co., No. 2:13-cv-186,

---

[1] Record citations are to PDF pages rather than internal document pages.

2013 WL 5563303, at *1 (D. Utah Oct. 7, 2013) (citation omitted).  "[The court] must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor."  Boyz Sanitation Serv., Inc. v. City of Rawlins, 889 F.3d 1189, 1195 (10th Cir. 2018).

## ANALYSIS

### I.  Scope of Challenged Utah Bar Activities.

Before reaching the merits of Ms. Pomeroy's claims, the court must first determine what material it should examine to decide the parties' motions.  This issue is of particular importance because Ms. Pomeroy challenged many Utah Bar activities in her motion for summary judgment that she did not reference in her complaint.  (See Defs.' Opp'n to Pomeroy Mot. Summ. J., ECF No. 134 at 1; see also ECF No. 2 at ¶¶ 42–50.)

"[T]he liberal pleading standard for … complaints under [Fed. R. Civ. P.] 8(a) … [typically] does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage."  Navajo Nation Hum. Rights Comm'n v. San Juan Cnty., 281 F. Supp. 3d 1136, 1149 (D. Utah 2017) (citation omitted).  But "failure to set forth in the complaint a theory upon which the plaintiff could recover does not bar a plaintiff from pursuing a claim."  Rodriguez v. Cascade Collections LLC, 532 F. Supp. 3d 1099, 1112–13 (D. Utah 2021) (quoting McBeth v. Himes, 598 F.3d 708, 716 (10th Cir. 2010)).  A court may allow a plaintiff to "constructively amend the [complaint] by means of [a] summary-judgment motion," by applying the same standard that governs motions to amend.  Id. at 1113 (citation omitted).  Federal Rule of Civil Procedure 15 directs that "[t]he court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "If the new theory prejudices the other party in maintaining its defense, however, courts will not permit the plaintiff to change her theory."  McBeth, 598 F.3d

5

at 716.  Courts finding "undue delay, bad faith, or dilatory motive" may also prevent the plaintiff

from adding new claims.  Rodriguez, 532 F. Supp. 3d at 1113 (citing Ahmad v. Furlong, 435 F.3d

1196, 1202 (10th Cir. 2006)).

The court finds that the new allegations are unduly delayed.  Ms. Pomeroy filed her

complaint on April 13, 2021.  (See ECF No. 2.)  She filed her summary judgment motion nearly

two years later.  (See ECF No. 127.)  In Rodriguez, the court noted that "[b]ecause [the plaintiff]

asserted the new claims relatively early in the litigation—and while fact discovery was still

open—the court finds no undue delay."  532 F. Supp. 3d at 1113.  Here, Ms. Pomeroy asserted

the new allegations 21 months after filing her complaint, after fact discovery had closed.

But Ms. Pomeroy is not adding entirely new claims; instead, she points to additional

examples to support her original claims.  Furthermore, the Utah Bar has already addressed the

additional Utah Bar Journal articles and social media posts in its briefing.  (See ECF No. 134 at

25–34.)  Finding no prejudice to the Utah Bar, the court will therefore consider this new material.

In contrast, there is insufficient information in the record for the court to review the

pieces of legislation Ms. Pomeroy challenged for the first time in her motion for summary

judgment.  Ms. Pomeroy's source for this legislation is "www.utahbar.org.legislative" (see ECF

No. 127-1), and she provides the court with the Title and Number of the Legislation, the Prime

Sponsor, and the outcome and date of the vote taken on the legislation by the Utah Bar's

governmental relations committee.  (ECF No. 127 at 10–15; Table of Bills & Votes, ECF No.

127-26.)  She also includes "Brief Summaries," but the origin of these summaries is unclear.

(ECF No. 127 at 10–15.)  With this limited information, it is not possible for the court to analyze

the Utah Bar's lobbying on this legislation without speculating about the content of the

legislation and the Utah Bar's activities.  See GeoMetWatch, 38 F.4th at 1200 ("[A]n inference is

unreasonable if it requires a degree of <u>speculation</u> and conjecture that renders [the factfinder's] findings <u>a guess or mere possibility</u>." (citation omitted)).

There is more information in the record to analyze a proposal related to the injunctions standard in the Utah Rules of Civil Procedure, which is also tied to an abortion trigger law (H.J.R. 2).  (Emily Anderson Stern, <u>'Expression of unchecked power': Court may be forced to reconsider hold on Utah's abortion ban soon</u>, Salt Lake Trib. (Jan. 23, 2023, 3:59 PM), https://www.sltrib.com/news/politics/2023/01/23/expression-unchecked-power-court/, ECF No. 127-32; Memorandum on H.J.R. 2, ECF No. 127-30; Joint Resolution Amending Rules of Civil Procedure on Injunctions, ECF No. 127-31.)  But, as the Utah Bar notes, the law was still being debated when Ms. Pomeroy filed her motion.  (<u>See</u> ECF No. 134 at 26).  Consequently, the court will not analyze Ms. Pomeroy's objection to this legislative activity and will only examine the legislation that Ms. Pomeroy challenged in the complaint.

## II.   First and Fourteenth Amendment Claims Based on Compelled Membership in the Utah Bar.

Ms. Pomeroy claims that by compelling her membership in the Utah Bar and engaging in non-germane activities, the Utah Bar has violated her rights to freedom of speech and association.  The Supreme Court has twice addressed such challenges.

First, in <u>Lathrop v. Donohue</u>, the Court considered whether a state bar's "compelled financial support of group activities" violated freedom of association rights.  367 U.S. 820, 828, 843 (1961) (plurality).  The plaintiff challenged the integration of the Wisconsin Bar, arguing that he was "coerced to support an organization which is authorized and directed to engage in political and propaganda activities."  <u>Id.</u> at 822.  Specifically, he challenged the bar's "promot[ion of] law reform" and its efforts to "make[] and oppose[] proposals for changes in laws and constitutional provisions and argue[] to legislative bodies and their committees and to

7

the lawyers and to the people with respect to the adoption of changes in codes, laws, and constitutional provisions." Id.  Contrary to the plaintiff's "convictions and beliefs[,]" the Wisconsin State Bar also "used its employees, property and funds in active, unsolicited opposition to the adoption of legislation … which was favored by the plaintiff." Id.  The plurality held that "legislative activity is not the major activity of the State Bar." Id. at 839.  And because "the bulk of State Bar activities serve the function … of elevating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State," a "legitimate end of state policy[,]" the Wisconsin State Bar did not violate the freedom of association right by engaging in the challenged activities. Id. at 843.  But noting the lack of a full record, the plurality of the court declined to address whether the use of the plaintiff's dues money "to support the political activities of the State Bar" was a violation of the plaintiff's free speech rights. Id. at 844–45.

The Court reached that question three decades later in Keller v. State Bar of California. 496 U.S. 1, 9, 14 (1990).  The petitioners—California State Bar members—claimed that through various activities, including lobbying and holding conferences, the California State Bar "expends mandatory dues payments to advance political and ideological causes to which they do not subscribe, in violation of their First and Fourteenth Amendment rights to freedom of speech and association." Id. at 1.  The Court held that a state bar may fund activities using mandatory member dues without violating free speech rights if the activities are germane. Id. at 14.  An activity or expenditure is germane if it is "necessarily or reasonably incurred for the purpose of regulating the legal profession or improving the quality of the legal service available to the people of the State." Id. (citation omitted).  The Court noted that "the extreme ends of the [germaneness] spectrum are clear: [c]ompulsory dues may not be used to endorse or advance a

gun control or nuclear weapons freeze initiative[,]" but may be spent on activities "connected with disciplining members of the Bar or proposing ethical codes for the profession." Id. at 16. But the Keller Court only addressed the petitioners' freedom of speech challenge and not their request for an "injunction prohibiting the State Bar from using its name to advance political and ideological causes or beliefs[,]" both because the lower courts did not address this claim and because the "request for relief appear[ed] to implicate a much broader freedom of association claim than was at issue in Lathrop." Id. at 17.

The Tenth Circuit recently pointed to this statement when it reversed a lower court's decision granting a motion to dismiss a challenge to the activities of the Oklahoma Bar, noting that "[n]either Lathrop nor Keller addressed a broad freedom of association challenge to mandatory bar membership where at least some of a state bar's actions might not be germane to regulating the legal profession and improving the quality of legal services in the state." Schell v. Chief Just. and Justs. of Okla. Sup. Ct., 11 F.4th 1178, 1194 (10th Cir. 2021). In Schell, the plaintiff argued that the Oklahoma Bar was using mandatory member dues to 1) publish articles in the Oklahoma Bar Journal that were non-germane and 2) engage in non-germane legislative activities. Id. at 1191–92. These arguments echoed the claims that litigants have made in several other challenges to compelled membership in integrated state bars.[2]

In its decision, the Tenth Circuit first considered whether the Keller decision remained good law after the Supreme Court's decision in Janus v. American Federation of State, County, and Municipal Employees, Council 31, 585 U.S. 878 (2018). Janus overturned Abood v. Detroit

---

[2] See McDonald v. Longley, 4 F.4th 229, 237 (5th Cir. 2021); Boudreaux v. La. State Bar Ass'n, 86 F.4th 620, 625 (5th Cir. 2023); Crowe v. Or. State Bar, 989 F.3d 714, 720–23 (9th Cir. 2021); Romero v. Colegio de Abogados de P.R., 204 F.3d 291, 293 (1st Cir. 2000); Taylor v. Buchanan, 4 F.4th 406, 407 (6th Cir. 2021); Kingstad v. State Bar of Wis., 622 F.3d 708, 709 (7th Cir. 2010); Gardner v. State Bar of Nev., 284 F.3d 1040, 1041 (9th Cir. 2002).

Board of Education, 431 U.S. 209 (1977),[3] the case on which Keller primarily relied, holding

that "exacting scrutiny, if not a more demanding standard, generally applies" in the Court's First

Amendment jurisprudence.  Janus, 585 U.S. at 885, 925.  The Tenth Circuit observed that Keller

was meaningfully distinct from Abood and held that "Janus did not overrule Keller's discussion

of Abood, or its related discussion of germaneness, as the test for the constitutionality of

mandatory dues and expenditures."  Schell, 11 F.4th at 1191.  This ruling is consistent with the

decisions of other Circuit Courts.  See, e.g., Crowe v. Or. State Bar, 989 F.3d 714, 725 (9th Cir.

2021) (rejecting view that Janus must be consulted when analyzing the plaintiff's Keller free

speech claim); Taylor v. Buchanan, 4 F.4th 406, 408 (6th Cir. 2021) (same); cf. Boudreaux v. La.

State Bar Ass'n, 86 F.4th 620, 626 (5th Cir. 2023) (applying "heightened First Amendment

scrutiny" but clarifying that "the constitutionality of mandatory bar associations still turned on

'germaneness.'").  The court is not persuaded by Ms. Pomeroy's argument that the court should

apply exacting scrutiny to the challenged Utah Bar activities.

　　　The Tenth Circuit also answered a question that was left open in Keller—namely, the

standard by which a court should evaluate the broader freedom of association claim that the

Keller Court mentioned but did not address.  See Keller, 496 U.S. at 17.  The Tenth Circuit

applied the germaneness standard to both the freedom of speech and freedom of association

claims: "In assessing whether the non-time-barred allegations in Mr. Schell's Amended

Complaint are sufficient to advance a claim for a free speech or freedom of association violation,

we consider the germaneness of the alleged activities to the valid goals and purposes" of the

---

[3] In Abood, the Supreme Court held that "agency shop" arrangements—"whereby every
employee represented by a union even though not a union member must pay to the union, as a
condition of employment, a service fee equal in amount to union dues"—were constitutional, so
long as the union expended an objecting individual's dues for activities germane to collective
bargaining.  431 U.S. at 211, 235–36.

Oklahoma Bar.[4]  Schell, F.4th at 1192 (emphasis added); see also Boudreaux, 86 F.4th at 628 ("If a bar's speech activities are germane, then there is no free association or free speech problem with compulsory membership.").

The Tenth Circuit determined that the plaintiff's claims "rest[ed] on two Oklahoma Bar Journal articles" neither party put in the record, thereby preventing the court from analyzing them.  Schell, F.4th at 1193–94.  On remand, the Tenth Circuit instructed the district court "to apply the test from Keller to determine whether the articles [were] germane to the accepted purposes of the state bar" and, if the articles were not germane, "to assess whether Mr. Schell may advance a freedom of association claim based on these two articles."  Id. at 1195.  But the Tenth Circuit declined to decide to "what degree, in quantity, substance, or prominence a bar association must engage in non-germane activities in order to support a freedom-of-association claim based on compelled bar membership."  Id. at 1195 n.11.  In other words, the Tenth Circuit suggested a multifactored approach to the analysis of a freedom of association claim involving non-germane speech and left open the possibility that a de minimis amount of non-germane speech would not run afoul of an objecting member's associational rights.

The Fifth Circuit rejected this suggestion, ruling that a state bar violates the freedom of association right when it engages in any non-germane activities.  Boudreaux, 86 F.4th at 636–37 (holding that Fifth Circuit caselaw did not support such an exception and that a de minimis standard would be "unworkable in the context of free speech").  The Fifth Circuit was

---

[4] The Ninth Circuit has suggested that Keller's germaneness standard does not necessarily apply to a freedom of association claim.  Crowe, 989 F.3d at 728–29 ("Given that [the Supreme Court and the Ninth Circuit] have never addressed such a broad free association claim, the district court will also likely need to determine whether Keller's instructions with regards to germaneness and procedurally adequate safeguards are even relevant to the free association inquiry.").  As discussed below, the Oregon District Court—citing the Tenth Circuit's decision in Schell—nevertheless applied the germaneness standard to the associational rights claim on remand.

unpersuaded by the argument that "mandatory bar associations could not exist" if "every single tweet and email must be strictly 'germane,'" noting that it was "not an impossible burden for bar associations to speak only on topics germane to their purposes." Id. at 637.  The Fifth Circuit proposed a hypothetical tweet supporting "the repeal of all antidiscrimination laws" as an example demonstrating the potential dangers of a de minimis exception.  Id.

This court declines to follow the Fifth Circuit's approach for several reasons.  First, the court is concerned about the burden that such a rigid standard would impose—on the court, if not the bar association.  The court's experience in this case, including Ms. Pomeroy's request at summary judgment to include additional content from recent bar journals and social media accounts, suggests that the lack of a de minimis exception could convert this court into a perpetual monitor of every bar journal article and social media post.  A single tweet wishing attorneys a happy Memorial Day or posting a picture of a puppy dressed like a judge could render mandatory state bars unconstitutional—or at least result in lengthy legal proceedings.

Moreover, and as discussed in more detail below, the Supreme Court has required integrated bars to provide refund mechanisms for member dues that are used for non-germane activities.  Keller, 496 U.S. at 16–17 (discussing requisite refund mechanisms, referred to as "Hudson procedures").  Such a system presupposes the possibility that a state bar might engage in at least some non-germane activities: the refund mechanism is what allows a state bar to cure these infringements on the freedom of speech.  But an opt-out procedure cannot cure a freedom of association violation.  See Taylor, 4 F.4th at 410 (Thapar, J., concurring) ("The speech claim would prevail if an integrated bar association used mandatory membership fees to fund non-germane political or ideological activity without providing adequate opt-out procedures … The association claim could go forward even if the bar association allowed lawyers to opt out of

funding ideological activity."); Crowe, 989 F.3d at 727, 729 (holding that the district court was correct to find that the adequacy of the Oregon State Bar's opt-out procedures protected the plaintiffs' free speech rights but that their freedom of association claim remained viable). Opt-out procedures (and several decades of jurisprudence evaluating the constitutionality of these procedures) would be superfluous if every instance of non-germane speech amounted to a violation of the freedom of association right.[5]

The Supreme Court did not adopt such a strict approach to the freedom of association claim in Lathrop, 367 U.S. at 843, but instead determined that there was no violation of the associational right because "the bulk of State Bar activities serve the function, or at least so Wisconsin might reasonably believe, of elevating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State ...." 367 U.S. at 843. It is true that Lathrop did not refer to the germaneness framework later adopted by Keller, and that courts must now define and address the broader freedom of association claim that Keller left unresolved, but Lathrop suggests that a holistic approach is useful in the freedom of association context.

Indeed, even the Fifth Circuit—though purporting to reject any de minimis exception—has evaluated certain bar activities in a holistic way. Finding that the publication of the Texas Bar Journal was germane to the practice of law, the Fifth Circuit did not analyze every article but rather considered the Journal's purposes as a whole:

> The Texas Bar Journal publishes information related to regulating the profession and improving legal services. Such information includes, among other things, (1)

---

[5] The Fifth Circuit has characterized Hudson procedures as "prophylactic 'safeguards' designed to prevent the spread of non-germane activities." Boudreaux, 86 F.4th at 638. But if engaging in any non-germane activity amounts to a violation of a bar member's right to freedom of association, then it is unclear how the opt-out procedures—utilized after a bar has engaged in said activity—could be prophylactic.

notices regarding disciplinary proceedings against Bar members, see Tex. R. Disciplinary P. 6.07; (2) announcements of amendments to evidentiary and procedural rules, see Tex. Gov't Code § 22.108(c); id. § 22.109(c); (3) "public statements, sanctions, and orders" issued by the State Commission on Judicial Conduct, see id. § 33.005(e); and (4) articles "devoted to legal matters and the affairs of the [Texas] Bar and its members," Tex. State Bar R. art. IX. Moreover, the Journal purports to feature articles advancing various viewpoints, and, in any event, includes a disclaimer clarifying that the Bar does not endorse any views expressed therein.

McDonald v. Longley, 4 F.4th 229, 252 (5th Cir. 2021).[6]

For these reasons, this court follows the approach adopted by the District of Oregon in a recent case. Crowe v. Or. State Bar, No. 3:18-cv-2139, 2023 WL 1991529 (D. Ore. Feb. 14, 2023). On remand from the Ninth Circuit, the district court was faced with a challenge to mandatory membership in the Oregon State Bar. The district court applied the germaneness framework to the associational rights claim as suggested by the Tenth Circuit in Schell. Id., at *1. The court also disagreed with "the Fifth Circuit's ultimate conclusion in McDonald that the mere fact that an integrated bar engages in 'some' nongermane activity means that the bar violates associational rights under the First Amendment, without considering whether there is a threshold, or de minimis, amount of nongermane activity that is acceptable." Id., at *5. Without delineating a precise threshold for nongermane activity, the court held that "a single statement (or even two statements) will not meet it." Id.

---

[6] The Journal's disclaimer that the Texas Bar does not endorse specific views is more likely to alleviate freedom of association concerns than freedom of speech. A bar member may object to the use of their dues for the publication of various views regardless of whether the bar endorses those views, but it is unlikely that a reasonable person would attribute the beliefs expressed by an article in a state bar journal containing such a disclaimer to the state bar's members. See Lathrop, 367 U.S. at 859 (Harlan, J., concurring) ("Surely the Wisconsin Supreme Court is right when it says that [a mandatory state bar member] can be expected to realize that everyone understands or should understand that the views expressed are those of the State Bar as an entity separate and distinct from each individual." (citation omitted)).

The court therefore analyzes Ms. Pomeroy's claims as follows.  For her freedom of speech claim, the court follows <u>Keller</u> and <u>Schell</u> by 1) analyzing the germaneness of the challenged articles and activities and 2) considering whether the Utah Bar has developed adequate opt-out procedures.  For her freedom of association claim, the court begins by analyzing the germaneness of the challenged articles and activities.  Should the court find that the Utah Bar has engaged in non-germane activities, the court will follow the Tenth Circuit's suggestion to analyze the "quantity, substance, [and] prominence" of the non-germane conduct.  <u>Schell</u>, 11 F.4th at 1195 n.11.  In other words, the court will assess 1) the amount of non-germane conduct; 2) the substance of that conduct, including whether the conduct is political or ideological; and 3) the prominence of that conduct, including whether a disclaimer would prevent a reasonable person from attributing the conduct to the beliefs of an objecting member.

With this framework in mind, the court first addresses the germaneness of the Utah Bar's challenged activities.

### A.  <u>Utah Bar Journal</u> Articles Challenged in the Complaint

Ms. Pomeroy challenges several <u>Utah Bar Journal</u> articles.  The complaint first identifies a January/February 2021 <u>Utah Bar Journal</u> issue discussing a claim that the Utah Bar has played an active role in major public policy debates, including debates about the Utah Supreme Court's role in regulating the practice of law and what criteria should be considered when filling judicial vacancies.[7]  (ECF No. 2 at ¶ 42.)  This issue, to the extent it refers to these debates, is germane.

---

[7] The same issue mentions that the Utah Bar has played an active role in a major public policy debate about the taxation of legal services.  (ECF No. 2 at ¶ 42.)  Ms. Pomeroy specifically points to the Utah Bar's advocacy surrounding H.B. 441, the "Tax Equalization and Reduction Act."  (<u>Id.</u> ¶ 43.)  The court discusses whether the Utah Bar's advocacy on this bill is germane in Section B below.

The supreme court's role in regulating the practice of law impacts the regulation of the legal profession. The debate over what criteria should be considered when filling judicial vacancies affects who sits on the court, which in turn impacts the regulation of the legal profession and affects the structure and integrity of the judicial system and associated attorney services. See Schell, 11 F.4th at 1193.

Second, Ms. Pomeroy's complaint identifies the May/June 2018 Utah Bar Journal issue, which "state[s] that the 2018 General Session [of the Utah State Legislature] was successful for the Utah Bar, as [its] leaders influenced the language of legislation and enhanced the bar's relationship with lawmakers and staff." (ECF No. 2 at ¶ 46 (citation omitted).) This statement highlights the important role of the Utah Bar and its attorneys in using their professional skills to interpret and advise on pending legislation that may affect the legal profession. See Schell, 11 F.4th at 1193. Such a statement is germane. And it relates to the Utah Bar's "core function to advance the interests of the profession." Id.

Finally, the complaint alleges that recent Utah Bar Journal issues have included statements that opine on current controversies. Ms. Pomeroy points to three articles in the March/April 2021 issue. The first is an article by then-Utah Bar President Heather Farnsworth that asserts the importance of pursuing "equity" as distinct from "equality." (ECF No. 2 at ¶ 50.) The second is an article calling for courtrooms to include "safe space[s]" where unfairness allegations will not be treated with "defensiveness and denial." (Id.) The same article invokes the concept of "implicit bias." (Id.) And the third is an article reviewing a book that proposes criminal penalties for anyone who is made aware of a sexual assault but chooses to protect the institution over the assault survivor. (Id.)

These three articles involve political or ideological topics.  See Schell 11 F.4th at 1193 (finding that the following materials are inherently political or ideological: 1) an article criticizing big money and special interest groups making campaign contributions and electing judges and 2) an article advocating for the ability of prisoners to bring tort claims against jails). But although these activities are of a political or ideological nature, they are not necessarily non-germane.  See Keller, 496 U.S. at 14.

In her article, President Farnsworth reiterates the Utah Bar's commitment to improving diversity among the Board of Bar Commissioners and the bar membership.  (Mar./Apr. 2021 Utah Bar Journal Issue, ECF No. 68-1 at 14.)  She distinguishes between equality and equity to argue that both are necessary to promote inclusion and truly benefit from diversity.  (Id.) "[E]quality does not take demographic related needs into account, while equity strives to identify the specific requirements of an individual's needs" based on their characteristics.  (Id.)  President Farnsworth also recognizes that there are benefits to increasing diversity and inclusion within the Utah Bar's leadership and among its members.  "Beyond the public perception and confidence in our system[,] diversity affects the quality of legal services and judicial decisions."  (Id. (citation omitted).)  Further, "[t]he [American Bar Association (ABA)] finds [that] a diverse legal profession is more just, productive, and intelligent because diversity, both cognitive and cultural, often leads to better questions, analysis, solutions, and processes."  (Id. (citation omitted).)

Articles on diversity initiatives "aimed at 'creating a fair and equal legal profession for minority, women, and LGBT attorneys'" have been found to be germane.  McDonald, 4 F.4th at

249.  President Farnworth's article advocating for the creation of a more fair, equal, productive, and intelligent legal profession in Utah is germane.[8]

The article calling for courtrooms to include "safe spaces" and invoking the concept of "implicit bias" is also germane.  In this article, The Road to Solutions: Systemic Racism and Implicit Bias in Prosecution, the authors call for safe spaces in courtrooms to raise the issues of systemic racism and implicit bias.  (ECF No. 68-1 at 26–27.)  "Everyone in the courtroom should be free to be anti-racist, … and … shine a light on unconscious bias or racial inequities without the fear of backlash.  Raising fundamental fairness issues must be normalized in our profession." (Id.)  The article closes by inviting prosecutors, and fellow lawyers, to join in this commitment. (Id.)  An article calling on the judicial system to improve the administration of justice and advance a fair, inclusive, and accessible justice system is germane, and Ms. Pomeroy fails to advance any persuasive arguments to the contrary.  See Crowe, 2023 WL 1991529, at *3 ("Plaintiffs do not explain how … improving the administration of justice, or advancing a fair, inclusive, and accessible justice system do not fall within the acceptable spectrum.  Indeed, other federal appellate courts have concluded that [speech] … falling within these categories [is] germane.").  Advocating for conduct that enhances the public's trust in the judicial system and associated attorney services is also germane.  Id. (citing Schell, 11 F.4th at 1193).

The book review about criminal penalties for anyone made aware of a sexual assault, but who chooses to protect the institution over the assault survivor, is also germane.  As the book

---

[8] Relevant to Ms. Pomeroy's freedom of association challenge, this issue of the Utah Bar Journal has a disclaimer that reads: "Statements or opinions expressed by contributors are those of the authors and not necessarily those of the Utah Bar Journal or the Utah State Bar."  (ECF No. 134 at 9.)  This disclaimer is in all Utah Bar Journal issues.  The Utah Bar presented the court with full Utah Bar Journal issues because Ms. Pomeroy's submissions left out the disclaimer in each issue.  (See id.)

review states, the main topic raises many relevant questions, including: "Can we criminalize the behavior of someone who fails to act when they know someone is being harmed? And if so, should we?" (ECF No. 68-1 at 43.)  The article reviewing the book does not condone its ideas. (See id. at 43–44 (discussing ideas the book brings up, including focusing on root causes and prevention for the lack of reporting of sexual assaults).)  These ideas and themes focus on access to justice for a particular group: sexual assault survivors.  See Crowe, 2023 WL 1991529, at *5. Even if these ideas and themes could "be construed as inflammatory or ideological that does not mean they are nongermane," so long as they are "reasonably related to the advancement of the acceptable goals of the [Utah Bar]."  See id. (citation omitted).  This article is therefore germane to the Utah Bar's permitted functions, which ultimately advance the interests of the profession. See Schell, 11 F.4th at 1193.

## B. Lobbying Activities Challenged in the Complaint

The first piece of legislation Ms. Pomeroy identifies in her complaint is proposed legislation affecting the attorney general's ability to invoke a potential conflict of interest or attorney-client privilege (H.B. 198).  (See May/June 2018 Utah Bar Journal Issue, ECF No. 68-7 at 27–28.)  After a U.S. congressman resigned, Utah conducted its first special election for a vacancy in the U.S. House of Representatives, and the Utah Governor and legislature disagreed about how to implement the election.  (Id.)  The legislature requested an opinion from the attorney general, while the attorney general was already counseling the Governor on the issue, making both parties clients of the attorney general under Utah Code Subsection 67-5-1(7) and Utah Constitution article VII, section 16.  (Id.)  The proposed legislation would have prevented

the attorney general from invoking a potential conflict of interest, or the attorney-client

relationship, to withhold the release of the opinion from the legislature.  (Id.)

The court agrees with the Utah Bar that lobbying against the proposed legislation is

germane.  The legislation was "directly targeted at Utah's lead lawyer and sought to regulate him

in his role as a lawyer."  (ECF No. 128 at 21.)  The proposed change would have altered the

ethical regulations governing the practice of law.  (Decl. Elizabeth Wright, ECF No. 129-1 at ¶ 6

("The Utah State Bar opposed the bill because it believed … the bill attempted to regulate the

practice of law, by amending the conflict of interest and attorney-client confidentiality rules in

the Utah Rules of Professional Conduct.").)  The legislation refers to the Utah Rules of

Professional Conduct, demonstrating that the legislation sought to modify the ethical

responsibilities of an attorney as an attorney rather than as a public official.  Reflecting the

states' "strong interest in allocating to the members of the bar, rather than the general public the

expense of ensuring that attorneys adhere to ethical practices," Harris v. Quinn, 573 U.S. 616,

655–56 (2014), Utah Bar opposition to legislative interference with the ethical rules governing

attorneys is germane.

The second piece of legislation that Ms. Pomeroy cites is H.B. 441, the "Tax Equalization

and Reduction Act."  (ECF No. 2 at ¶ 43.)  "The Act proposed a new tax on services broadly in

the state of Utah, which would include legal services."  (Order & Mem. Decision, ECF No. 94 at

12.)  The Utah Bar has clarified that while the Act itself was a comprehensive bill, the Utah Bar

"limited its lobbying efforts to opposing the proposed tax on legal services because it believed

the tax would exacerbate access to justice problems, directly reducing the quality and availability

of legal services in the state."  (ECF No. 128 at 22.)  The Utah Bar explains that, in opposing the

bill, the Utah Bar objected to direct increases in the costs of legal services, instead of indirect increases. The court finds that this lobbying effort, too, is germane.

### C. Utah Bar Activities Challenged for the First Time at Summary Judgment

As stated above, the court will review most of the additional Utah Bar activities that Ms. Pomeroy challenges for the first time at summary judgment. Specifically, the court will review the additional Utah Bar Journal articles and social media posts that Ms. Pomeroy alleges amount to violations of her rights. The court holds that these activities, too, are germane.

Ms. Pomeroy's motion for summary judgment identifies two articles, three tweets, and an advertisement focused on diversity, equity, inclusion, and increasing access to justice.[9] As stated above, "courts have concluded that articles and initiatives [with similar focuses] are germane." Crowe, 2023 WL 1991529, at *3; see also McDonald, 4 F.4th at 249 (finding diversity initiatives "aimed at creating a fair and equal legal profession" to be germane).

Ms. Pomeroy identifies two other articles about the rule of law and civility. The first is Judicial Independence and Freedom of the Press, which advocates for protecting and

---

[9] Then-Utah Bar Journal President Robert Rice wrote the first article: The Utah Center for Legal Inclusion. (See Mar./Apr. 2017 Utah Bar Journal Issue, ECF No. 134-2 at 13–15.) The theme of the article was diversity in Utah's legal community. (Id.) The second article—Script for Mock Board Meeting of Pure Play, Inc.—discussed "[b]oard diversity" and how some jurisdictions are adopting "minimum female representation" mandates for boards of directors. (Jan./Feb. 2018 Utah Bar Journal Issue, ECF No. 134-3 at 30.) University of Utah Law reposted the first of the three tweets on September 12, 2022, and it celebrated a graduate's "Living Color Award." (Retweet dated Sept. 12, 2022, ECF No. 127-15.) The second tweet is a July 30, 2021, tweet the Utah Bar reposted, which states: "Listening to @DrWilliamASmith at the @UtahStateBar summer convention. Racism is a public health crisis. Racism is an act of violence. What are the perceptions of African American men?" (Retweet dated July 30, 2021, ECF No. 127-17.) And the third is a tweet that says: "strong public support for admitting Dreamers into the [Utah Bar]" and includes a link to an article reporting the same. (Tweet dated Jan. 22, 2020, ECF No. 127-18.) Ms. Pomeroy claims that the Summer Convention Advertisement highlighted equity and inclusion dialogue sessions, but the advertisement itself does not mention equity and inclusion. (See ECF No. 68-1 at 58.)

strengthening democracy and the rule of law.  (Mar./Apr. 2019 Utah Bar Journal Issue, ECF No. 134-4 at 27–31.)  The second is Civility in a Time of Incivility, which encourages Utah lawyers to practice civility and comply with Utah Standards of Professionalism and Civility.  (Civility in a Time of Incivility, ECF No. 127-13.)  These articles are germane, as they enhance public trust in the judicial system and associated attorney services.  See Schell, 11 F.4th at 1193.

Next, Ms. Pomeroy's motion identifies an article in the November/December 2018 Utah Bar Journal issue about a World War II-era Japanese internment camp in Topaz, Utah.  (ECF No. 127 at 4.)  According to Ms. Pomeroy, the article argues that "some are currently trying to again elevate war powers to suppress the rights of vilified minorities[.]"  (Id.)  This is incorrect.  The article discusses "a place in the central Utah desert that stands as a living memorial to … Korematsu v. United States."  (Nov./Dec. 2018 Utah Bar Journal Issue, ECF No. 129-14 at 22–25.)  In the article, a law student who joined attorneys visiting the former internment camp reflected on the experience.  Seattle University School of Law Professor Lorraine Bannai joined attendees by Zoom to talk about her advocacy focused on correcting Korematsu.  (Id. at 23–24.)  In her remarks, Professor Bannai shared with the group that she worried the Supreme Court will repeat its mistakes in Korematsu, citing the Trump administration's travel bans.  (See id. at 25.)

The article's author does not endorse these comments, but the author merely provides context for the visit.  The article informs attorneys of the consequences of litigation and judicial opinions.  It acknowledges that lawyers and judges make mistakes, but that they can rectify those mistakes.  The article also calls for Utah attorneys to visit the Topaz site to learn about its history.  For these reasons, this article is "reasonably incurred for the purpose of" regulating the legal profession and improving the quality of legal service available to the people of the state.  Keller, 496 U.S. at 14.

22

Next, Ms. Pomeroy identifies two articles that better equip Utah Bar attorneys to use their professional skills to interpret and advise on legislation concerning various subjects and counsel clients on related matters.  See Schell, 11 F.4th at 1193.  These articles are germane.  The first discusses proposals to reduce drug prices and alleviate the opioid crisis and issues facing the drug market. (Mar./Apr. 2020 Utah Bar Journal Issue, ECF No. 134-5 at 34–42.)  It also includes opioid crisis solutions for Utah attorneys.  (Id. at 41–42.)  The second explains the cryptocurrency market, identifies critiques and defenses of it, and remarks on challenges the cryptocurrency industry faces.  (Jan./Feb. 2023 Utah Bar Journal Issue, ECF No. 134-7 at 19–27.)

Next, Ms. Pomeroy's motion identifies an article titled Silver Linings of the Pandemic. (ECF No. 127 at 6.)  This article advocates for the idea that, post-pandemic, Utah Bar lawyers should have the option to work from home or appear before the court virtually.  (ECF No. 68-1 at 17–19.)  Promoting this idea—providing flexibility to Utah Bar lawyers to improve their practice—is germane.

Ms. Pomeroy also identifies a USB LinkedIn post, in which the Utah Bar shared a post from Utah Governor Spencer Cox celebrating the passage of pieces of legislation.[10]  (LinkedIn Post, ECF No. 127-20.)  By sharing Governor Cox's post, the Utah Bar is keeping members informed about legislation they might be called to advise on or that affects them in their practice. See Schell, 11 F.4th at 1193.  This LinkedIn post is germane.

---

[10] Neither party has briefed whether the Utah Bar's LinkedIn page contains a disclaimer similar to the disclaimer in all Utah Bar Journal issues.  While the LinkedIn posts Ms. Pomeroy challenges are germane, the lack of a disclaimer on the Utah Bar's page might contribute to a freedom of association violation under Schell if the Utah Bar posted or reposted non-germane content.  As mentioned above, the presence of a disclaimer that prevents a reasonable person from attributing the conduct to the beliefs of an objecting member is one factor a court may examine to decide whether the freedom of association right has been violated.

Ms. Pomeroy challenges another Utah Bar LinkedIn post, through which the Utah Bar shared a post from the ABA inviting people to participate in a 21-day Native American Heritage Equity Habit-Building Challenge syllabus.  (ECF No. 127 at 7–8.)  This is germane, as the Utah Bar is alerting its members to an optional event that fosters growth, learning, and community in the legal profession.  See Boudreaux v. La. State Bar Ass'n, 620 F. Supp. 3d 440, 458 (E.D. La. 2022) (finding optional activity with similar purposes to be germane).

Finally, Ms. Pomeroy's motion points to a Utah Bar Journal article titled The Times They Are a Changin'.  (ECF No. 127 at 4.)  Ms. Pomeroy argues that the article criticizes the electoral college system (id.), but the court finds that a better characterization is that the article uses satire and sports analogies to explain arguments for and against the electoral college.  (ECF No. 134-2 at 23–26.)  The article compares the transition of power from one presidential administration to the next to a corporate takeover, presenting "lessons … for Donald Trump," who had recently been elected.  (Id. at 25.)

This article presents a closer question about whether it is germane.  From a wider perspective, lawyers must understand the electoral system and the Constitutional scheme for a presidential election.  These principles relate to democracy and the rule of law, and a better understanding of this system "help[s] … build and maintain the public's trust in the legal profession and the judicial process ...."  Crowe, 2023 WL 1991529, at *3.  On the other hand, the electoral system is less directly related to the legal profession than other content discussed in the Utah Bar Journal.  Also, the article was published after the 2016 presidential election, in which Donald Trump was elected President after losing the popular vote.  Many people called for the

end of the electoral college system as a result.[11]  Given this context, the article is politically

charged.  But even topics that involve "a sensitive political topic" can be germane.  McDonald, 4

F.4th at 249.  For these reasons, the court finds that reasonable minds could disagree about

whether the article is germane.

Yet whether this single article is germane is not dispositive.  It is one Utah Bar Journal

article out of many Utah Bar activities that Ms. Pomeroy challenges in her complaint and at

summary judgment.  While politically charged to a degree, the article presents its ideas in a

neutral way.  The Utah Bar Journal issue containing this article, like all issues, has a disclaimer

that would prevent a reasonable person from attributing the viewpoint expressed in the article to

the beliefs of an objecting member.  Consequently, when taking these factors into consideration,

the court finds that the Utah Bar did not violate Ms. Pomeroy's freedom of association rights by

publishing this article.

All the other activities Ms. Pomeroy challenges in her complaint and at summary

judgment are germane.  As a result, the Utah Bar has not violated Ms. Pomeroy's rights to

freedom of speech and association.

### III.   First and Fourteenth Amendment Claim for Lack of Adequate Procedural Safeguards.

Ms. Pomeroy raises a facial challenge to the Utah Bar's refund procedures: "Even if the

[c]ourt finds that Plaintiff is not entitled to summary judgment regarding the nongermane content

in the Utah Bar Journal, the [Utah Bar] nevertheless has the ability to publish nongermane

content in that journal in the future."  (ECF No. 127 at 30.)  By lacking procedural safeguards to

---

[11] See, e.g., Joseph P. Williams, Time for a Change?, U.S. News & World Rep. (Dec. 13, 2016),
https://www.usnews.com/news/the-report/articles/2016-12-13/advocates-call-for-an-end-to-the-
electoral-college-after-trumps-win.

refund non-germane activities, Ms. Pomeroy argues that the Utah Bar has violated the First and Fourteenth Amendment rights to free speech.

The court previously allowed this claim to proceed because the Utah Bar had conceded that, although it offered refunds for its legislative activities, it did not provide a refund mechanism for non-germane non-legislative activities. (ECF No. 94 at 14.) The Utah Bar is correct that "[a]s for legislative activity, there is no question that the [Utah Bar's] policy complies with <u>Keller</u>. That is because the [Utah Bar] does not attempt to distinguish between germane and nongermane legislative activities and simply refunds all of a member's pro rata fees used for those activities." (ECF No. 128 at 42.) But at issue now is the refund for non-germane non-legislative activities.

In <u>Keller</u>, the court held that because integrated bars cannot use mandatory member dues to fund non-germane activities, they must provide a refund mechanism for such activities. 496 U.S. at 16–17. <u>Keller</u> affirmed <u>Chicago Teachers Union, Local No. 1, AFT, AFL-CIO v. Hudson</u>, 475 U.S. 292, 310 (1986), which held that unions must adopt refund procedures that: (1) provide an adequate explanation of the basis for the fee; (2) a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker; and (3) an escrow for the amounts reasonably in dispute while such challenges are pending. 496 U.S. at 16 (citation omitted). The Supreme Court in <u>Keller</u> reserved the question whether, in the context of an integrated bar, each of these requirements was mandatory or whether alternative procedures would likewise satisfy the obligation of an integrated bar to protect against members' licensing fees being spent on non-germane activities. <u>Id.</u> at 17. The Tenth Circuit in <u>Schell</u> did not analyze the Oklahoma Bar's refund procedures because the Bar adopted procedures consistent

with the plaintiff's commands after the litigation began, which mooted the plaintiff's procedural safeguards claim.  11 F.4th at 1182.

Other courts have disagreed on whether the <u>Hudson</u> procedures are mandatory.  <u>Compare Crowe</u>, 989 F.3d at 726 (holding that alternative procedures can satisfy an integrated bar's obligations under <u>Keller</u>), <u>with</u> <u>McDonald</u>, 4 F.4th at 254 ("[G]iven that <u>Keller</u> indicated that <u>Hudson</u>'s procedures are sufficient, and <u>Janus</u> held even more protective procedures are necessary, <u>Hudson</u>'s procedures are <u>both</u> necessary and sufficient.").  This court is persuaded by the Ninth Circuit's reasoning in <u>Crowe</u> and holds that alternative procedures can satisfy an integrated bar's obligations under <u>Keller</u>.  Importantly, the <u>Keller</u> Court did not hold that "state bars [must] adopt procedures identical to or commensurate with those outlined in <u>Hudson</u>." <u>Crowe</u>, 989 F.3d at 726.  Moreover, as discussed further below, the court is not convinced that strict adherence to <u>Hudson</u> in the context of a state bar is "necessary—or even effective—to minimize infringement[.]"  <u>Id.</u>

Ms. Pomeroy asserts that the Utah Bar's refund procedures are constitutionally deficient for four reasons: (1) the Utah Bar's refund procedures do not include portions of the fees spent on non-germane non-legislative activities; (2) the Utah Bar's information about the legislative activities refund is based on "slipshod calculations," lacks evidence that the refund amount is equal to the amount spent on non-germane activities, and therefore is not an adequate explanation for the basis of the fee; (3) the Utah Bar's budgets impermissibly make members "undertake an exercise in forensic accounting"; and (4) the Utah Bar only allows members to opt out of speech they disagree with through a refund after the fact, rather than employing an "opt-in" procedure and obtaining "clear, free, and affirmative consent … before an association can use

an individual's coerced fees or dues to support its political and ideological activities." (ECF No. 135 at 27–29); see McDonald, 4 F.4th at 253 (citation omitted).

Ms. Pomeroy's first argument is moot because the Utah Bar has presented evidence that it now has a refund mechanism for non-germane non-legislative activities. (See Utah Bar's Keller Refund Request Policies and Procedures, ECF No. 129-21.) As discussed in the Written Notice section, "[a] Bar licensee who objects to the use of any portion of the licensee's license fees for activities he or she considers promotes or opposes political or ideological causes[12] which are not already included in the rebate may request" a refund via the detailed procedures. (Id. (emphasis added).) This procedure allows an objecting attorney to opt out of the bar's expenditure of her fees on non-legislative activities with which she disagrees.

Ms. Pomeroy's second argument lacks support in the record. First, her assertions that the refund is not equal to the amount spent on non-germane activities and that the legislative activities refund is based on "slipshod calculations" (and not an adequate explanation of the basis for the fee) are misplaced. The Utah Bar's refund procedures not only explain how the Utah Bar calculates the pro rata fees spent on legislative activities, but the procedures effectively provide members who apply for the legislative activities rebate with automatic refunds of the pro rata fees spent on such activities (see ECF No. 129-21 at 2 (explaining legislative refund procedures)), so long as they meet the other conditions set forth in the procedures (i.e., applying for a rebate in writing to the Executive Director after the Utah Bar Journal publishes its annual

---

[12] It is unsurprising that the Utah Bar has labeled its activities in this way. Given the uncertainty about how courts should evaluate broad freedom of association claims, and the fact that at least one court (the Fifth Circuit) has held that any non-germane activity amounts to a freedom of association violation, it is unlikely that a state bar would classify any of its speech activities as non-germane. See Boudreaux, 86 F.4th at 639 ("[A] prospective budget can only provide so much notice when a bar association can and must classify all of its speech activities as germane.").

28

notice of rebate (see id.)).  Ms. Pomeroy claims that instead of providing members an adequate explanation of the basis for the fee, "the [Utah Bar] simply asks members to trust its calculations" for pro rata fees.  (ECF No. 127 at 31.)  But the Utah Bar offers an explanation that the court finds sufficient: "That pro rata portion is determined by dividing the total amount spent on legislative activities into the total amount of license revenue collected to date and multiplying that dividend by the licensing fees paid by the member."  (ECF No. 129-21 at 2.)  To the extent Ms. Pomeroy is also arguing that the Utah Bar has not given an adequate explanation of the basis for the fees spent on non-germane non-legislative activities, Ms. Pomeroy has not presented the court with any examples of inadequate explanations the Utah Bar has given objecting members, nor has she explained what else the Utah Bar would need to provide members to comply with Hudson.

Ms. Pomeroy's third argument is that the Utah Bar's lengthy budgets fail to give members sufficient notice of the Utah Bar's activities.[13]  The Utah Bar's budgets contain a breakdown of expenditures by department, giving mostly generic descriptions of expenditures.  (See ECF Nos. 129-22–28.)  The Utah Bar's budgets resemble the Texas Bar's budgets in McDonald, in which the Fifth Circuit held that the budgets impermissibly "place[d] the onus on objecting attorneys to parse the Bar's proposed budget—which only details expenses at the line-item level, often without significant explanation—to determine which activities might be objectionable."  4 F.4th at 254.  That was "a far cry from a Hudson notice, which estimates the breakdown between chargeable and non-chargeable activities and explains how those amounts were determined."  Id. (citing Hudson, 475 U.S. at 307 n.18).

---

[13] The Utah Bar's budgets were provided to Ms. Pomeroy and the court in the appendix to the Utah Bar's motion for summary judgment.  (See Utah Bar Budgets, ECF Nos. 129-22–28.)

But the Utah Bar's generic descriptions of expenditures do not pose a constitutional problem because as discussed above, Keller did not hold that state bars are required to adopt procedures identical to those outlined in Hudson.  "Hudson required [a] high-level explanation in the context of a union that affirmatively planned to engage in activities unrelated to collective bargaining for which it could only charge its members.  The Court obligated the union to provide a detailed statement of fees in advance so that nonmembers could object before being charged for impermissible activities."  Crowe, 989 F.3d at 726 (emphasis added).  Ms. Pomeroy has not shown any affirmative plans by the Utah Bar to use members' dues for non-germane activities.  A more detailed breakdown between germane and non-germane activities would also not be possible given that the Utah Bar anticipates each year that all its expenditures will be germane.  (Defs.' Reply, ECF No. 141 at 19); see Crowe, 989 F.3d at 726 ("[A]dvance notice would not have offered additional protection against the alleged constitutional violations because [the] [Oregon Bar] would have characterized all of its activities as germane."); see also Boudreaux, 86 F.4th at 639 ("[A] prospective budget can only provide so much notice when a bar association can and must classify all of its speech activities as germane.").

Finally, the court finds that Schell forecloses Ms. Pomeroy's fourth argument.  The plaintiff in Schell brought a claim that contended that the Oklahoma Bar, "in accord with Janus, needed to create an opt-in dues system for the subsidization of political and ideological speech not germane to the goal of regulating the practice of law."  Schell, 11 F.4th at 1184–85.  While the district court did not dismiss a claim about "the [Oklahoma Bar's] alleged failure to adopt constitutionally adequate safeguards to prevent the impermissible use of mandatory bar dues[,]" it did dismiss the opt-in claim.  Id. at 1185–86.  The Tenth Circuit affirmed the district court's dismissal of the claim.  Id. at 1191.

None of Ms. Pomeroy's arguments about the Utah Bar's refund procedures are persuasive.  Given the adequacy of its procedures, the Utah Bar has not violated any member's free speech rights.

## ORDER

The Utah Bar has not violated Ms. Pomeroy's free speech and association rights by engaging in activities with which she disagrees, and its refund procedures do not violate its members' free speech rights.  Accordingly, the court ORDERS as follows:

1.      Ms. Pomeroy's motion for summary judgment (ECF No. 127) is DENIED.

2.      The Utah Bar's motion for summary judgment (ECF No. 128) is GRANTED.

DATED this 25th day of April, 2024.

BY THE COURT:

TENA CAMPBELL
United States District Judge